# In the United States Bankruptcy Court for the Southern District of Georgia
## Savannah Division

FILED
Samuel L. Kay, Clerk
United States Bankruptcy Court
Savannah, Georgia
By lbarnard at 12:05 pm, Jul 26, 2011

In the matter of: )
) Chapter 11 Case
MORGAN CENTER, LLC )
) Number 10-42145
        *Debtor* )

## MEMORANDUM AND ORDER ON THE COASTAL BANK'S OBJECTION TO DEBTOR'S DISCLOSURE STATEMENT AND PLAN

Debtor's Chapter 11 was filed on October 5, 2010. Debtor proposed a Disclosure Statement on March 25, 2011, which valued collateral pledged to The Coastal Bank ("TCB") at $7,635,000.00. Disclosure Statement, Dckt. No. 31, p. 2. The collateral is described as Lots 1, 3, 5, and 6 of a development known as Morgan Center ("Morgan Center Tract")—a six lot commercial and light industrial tract of land, zoned as a Planned Unit Development ("PUD"). Debtor estimated its debt to TCB, which is secured by the collateral, at $4,875,538.62. Id.

Debtor's Disclosure Statement reveals that it plans to convey to TCB a portion of the collateral in full satisfaction of the debt. Id. In particular, the Plan adopts Disclosure Statement values as follows:

| | |
|---|---|
| Lot 1 | $1,835,000.00 |
| Lot 3 | $2,850,000.00 |
| Lot 5 | $1,300,000.00 |

<pre>
         Lot 6              $1,650,000.00
         Total              $7,635,000.00
</pre>

Plan, Dckt. No. 32, p. 4 (Mar. 25, 2011). The Plan proposes to pay TCB by surrendering Lots 1, 5, and 6 (at a combined value of $4,785,000.00)—along with a cash payment of $90,538.62—in full satisfaction of the claim. Id. Debtor would retain Lot 3 to pay other claims in the case. Id.

TCB objected to the Disclosure Statement on numerous grounds. Objection, Dckt. No. 43. The threshold issue is whether to accept Debtor's proposed valuations. After discovery, the issue of valuation was set for trial on June 13, 2011. Both parties filed appraisal reports in advance of trial. Appraisals, Dckt. Nos. 49-51 (June 9, 2011). Debtor engaged the services of GB Appraisal, which supported the Debtor's value of $7,635,000.00. Exh. D-4. TCB engaged two appraisers: Crisler/Morrison and Company ("CM"), which concluded a value of $3,869,000.00 (Exh. TCB-3) and Coastal Realty Consultants, LLC ("CRC") which concluded a value of $2,585,000.00 (Exh. TCB-2).[1]

History of the Lots

As background to the appraisers' conclusions, the evidence reveals that

---

[1] It is at this point that I address the parties' appraisals. At times, parties will provide this Court with multiple appraisals for the same piece of property. While each appraisal is considered by the Court, I note that this kind of "shotgun" approach to valuation fails to propose clear and concise values, and needlessly and confusingly presents a mountain of data. The appraisals are not internally consistent and cannot be reconciled to one another. This approach undercuts the probative value of each appraisal.

Debtor acquired the entire Morgan Center Tract, approximately 150 acres, in December of 2005 for $5,779,620.00. Exh. TCB-3, p. 3. It was subdivided, per the PUD, into six distinct lots ranging in size from 4.556 acres to 62.866 acres. Id. Debtor installed significant high-quality infrastructure to support the development, intending to market the five light industrial tracts for first-class office or warehouse space and the single commercial site for retail use. Id. at 35.

Debtor sold Lot 4 of Morgan Center (the sixty-two acre tract) in 2006 for $5,343,600.00 ($85,000.00 per acre). Id. at 39. Lot 3 (the twenty-eight acre tract) went under contract in 2008 for $2,658,860.00 ($95,000.00 per acre), but the contract never closed. Id. at 3. Debtor sold Lot 2 (the seven acre tract), in 2007 for $505,120.00 ($70,000.00 per acre). Id. at 40. Debtor has been unable to sell any of the remaining four Lots since that time, despite having listed the properties for more than four years with a premier industrial and commercial real estate broker.

Current asking prices for the light industrial lots are $110,000.00 per acre for Lots 1 and 6, and $99,000.00 per acre for Lot 3. Id. at 1, 3. This Court has not been informed of the asking price for Lot 5.

The sales and listing history therefore can be illustrated as follows:

| LOT | SIZE (ACRES) | SOLD (TOTAL) | SOLD (PER ACRE) | OFFER (TOTAL) | OFFER (PER ACRE) | LISTED (TOTAL) | LISTED (PER ACRE) |
|---|---|---|---|---|---|---|---|
| 1 | 15.727 | - | - | - | - | $1,729,970 | $110,000 |
| 2 | 7.216 | $505,120 | $70,000 | - | - | - | - |
| 3 | 27.988 | - | - | $2,658,860 | $95,000 | $2,770,812 | $99,000 |
| 4 | 62.866 | $5,343,600 | $85,000 | - | - | - | - |
| 5 | 4.556 | - | - | - | - | UNK | UNK |
| 6 | 14.969 | - | - | - | - | $1,646,590 | $110,000 |

### The Appraisals

The GB appraisal (provided by Debtor) was a joint effort of Gary Beaver, Certified Appraiser, and Robert Gerhardt, MAI. Beaver served as the inspecting appraiser and author of the report and Gerhardt served as the "Non-Inspector Consultant and Review Appraiser." Exh. D-4, p. 2. Both testified. Gerhardt's role was exactly as described. He neither visited the property nor researched the various comparables used to arrive at the gross value. He did review and endorse the conclusions of Beaver–who performed all the supporting investigation, research and analysis. Gerhardt therefore adopts and advances Beaver's conclusions as his own.

The GB appraisal contains certain factual errors, misstatements, and other inexactitudes which call into question the care and professionalism which went into the final product. For example, he adopts per acre values for Lots 1 and 3 which are higher than the prices at which those tracts have been actively marketed for over four years. The GB appraisal concluded a value of $2,850,000.00 for Lot 3 when it has been unsuccessfully listed

at $2,770,812.00 for years. It concluded a value of $1,835,000.00 for Lot 1 when it has been unsuccessfully listed at $1,729,970.00 for years. There is nothing in evidence to justify these appraised values. Worse, Beaver's veracity was challenged on the basis of licensure problems he has had in Colorado and South Carolina. His license was revoked in Colorado (Exh. TCB-7) and suspended—although the suspension has been stayed—in South Carolina (Exh. TCB-8) due to "wrongful conduct . . . including grossly inflating an appraisal of residential property which resulted in financial injury . . . ." Order, Exh. TCB-7, p. 1.

Don Lindner, MAI, prepared and testified to the value found by CRC. Exh. TCB-2. Comer Morrison, MAI, prepared and testified to the value found by CM. Exh. TCB-3. Because of the infirmities of the GB appraisal, my conclusions will not be based on the GB appraisal. Testimony and reports from the CM and CRC appraisers are professional and comprehensive. Those two appraisals concluded very similar values for Lots 1, 3, and 6, although it is uncontradicted that they did not share information or conclusions with each other. There was, however, a large difference in the Lot 5 values concluded by CM and CRC.

Lot 5 (4.556 acres) is the sole commercial tract and reveals the widest spread of appraised values. After considering the record, I find the CM value for Lot 5 of $992,000.00 to be a more realistic valuation. Exh. TCB-3, p. 63. The best comparable for Lot 5 is a Nine Acre Lot which sold in July of 2010. Both the CM and CRC appraisals used

the Nine Acre Lot as a comparable for valuation purposes. Exh. TCB-3, p. 63; Exh. TCB-2, p. 50. While that sale occurred in an area of Pooler Parkway that is much more developed than the subject property, it closed in July 2010 and is the most recent of the commercial tract sales. It is therefore the most relevant comparable.

However, in determining the value of Lot 5 by way of comparison to the value of the Nine Acre Lot, CRC applied a 25% discount to Lot 5 due to location. Exh. TCB-2, p. 50. Given the subject's frontage on Pooler Parkway at the traffic-controlled intersection with the Morgan Center Spine Road (Exh. TCB-3, p. 32), I find that CRC's 25% location discount to the value of Lot 5 is not supported.

Accordingly, of the two TCB appraisals, I find that CM's appraisal reaches the most persuasive conclusion as to the overall value. That conclusion begins with the "Retail Lot Price" of $5,967,000.00. <u>CM Appraisal</u>, Exh. TCB-3, p. 65.

The Methodology

However, CM appraised the four Lots using a subdivision methodology, and accordingly applied a discounted cash flow adjustment to reach its proposed Market Value. This adjustment takes into consideration the fact that the Lots would be sold in bulk to an investor or developer. That developer would likely be unable to sell the Lots immediately and would hold them for a period of time, during which the Lots would be marketed. That

adjustment discounts the value to $3,869,000.00, what CM calls the "Market Value" of the Lots. Id. at 68.

Whether this adjustment is warranted was a subject of great debate at the hearing. GB valued the property as four separate parcels (the method it believed was requested by counsel), and expects a marketing period of twelve to eighteen months. Exh. D-4, p. 28. Despite this delay, it did not apply a discounted cash flow adjustment to its Retail Lot Price,[2] believing such an adjustment inapplicable in an appraisal of four separate tracts. GB therefore used the undiscounted Retail Lot Price as its appraised Market Value. If GB had appraised the four Lots using a subdivision methodology, it would have applied a discounted cash flow adjustment, as CM and CRC did. Id. at 21.

CM and CRC each appraised the four Lots using a subdivision methodology, and accordingly applied a discounted cash flow adjustment to reach their proposed Market Values. This adjustment is applied by deducting holding costs (taxes, insurance, maintenance, and other fees), sales costs (commissions and advertising), and a discount to compensate for risk, profit, and the time value of money. Exhibit D-1 captures the side-by-side Retail Lot Prices for each appraiser, and the discounted cash flow adjustments and Market Values for the CM and CRC appraisals. That exhibit also includes a hypothetical discounted cash flow adjustment to the GB value (pursuant to a request by this Court), to

---

[2]While this term does not appear in the GB appraisal, I use it here to draw comparisons between the two appraisals.

AO 72A
(Rev. 8/82)

7

illustrate its Market Value *if* the Court concludes that such a discount is appropriate.

The parties were granted time to submit post-hearing citations to Uniform Standards of Professional Appraisal Practice (or any other relevant source) so the Court could determine whether using the subdivision methodology is correct in this scenario. I have received and reviewed those submissions and found that they provide no conclusive answer. Ultimately, this Court bears the responsibility of determining the true value of the Lots. Because the Plan contemplates partial surrender to the lender—someone who is not the end user of the property—I find that the subdivision methodology is proper.

Conclusion

CM concluded a Market Value of $3,869,000.00 using the subdivision methodology. The subdivision methodology contemplates a sale to a single buyer, so the Market Value is determined by the amount that hypothetical buyer would be willing to pay for it today. Because of expected profit, holding periods, the time value of money, and the assumption of risk, I find that the hypothetical buyer would only be willing to pay $3,869,000.00 for the Lots today.

ORDER

For the foregoing reasons, it is ORDERED that the value of Lots 1, 3, 5 and 6 of Morgan Center have a value of $3,869,000.00 for purposes of Debtor's Plan and Disclosure Statement. Debtor is ORDERED to file with this Court an Amended Plan and

Disclosure Statement, consistent with the values set forth herein, within fourteen days of the entry of this Order.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia

This 26th day of July, 2011.